IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

GREGORY L. WINFORD                                                    PLAINTIFF

v.                  Civil No. 05-2146

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Gregory L. Winford, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits (DIB) under the provisions of Title II and supplemental security income benefits (SSI) under Title XVI of the Social Security Act. The court has before it the brief of the Commissioner (Doc. 10) and the transcript of the social security proceedings.

**Procedural Background:**

Winford protectively filed his applications for DIB and SSI on January 9, 2004. (Tr. 11, 63-65, 294a-294d). Winford alleged a disability onset date of September 1, 2001, due to injuries to his left arm, left leg, and both ankles sustained in a motor vehicle accident. (Tr. 12, 63, 74, 294a).

Winford's applications were denied initially and on reconsideration. (Tr. 24-25, 26-27, 294f, 294l). He requested a hearing before an ALJ. (Tr. 36). A hearing was held on June 1,

2005. (Tr. 295-333). Winford appeared and testified. (Tr. 300-323). Winford was represented by counsel. (Tr. 297). David O'Neal, a vocational expert, also testified. (Tr. 323-332).

By written decision dated July 26, 2005, the ALJ found that while the evidence established Winford had residuals of a motor vehicle accident (specifically, residuals of multiple fractures with an intramedullary rod in the left femur), cardiac arrhythmia, and borderline hypertension, impairments that were severe, there was no medical evidence of an impairment that met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 13). The ALJ the concluded Winford could not return to his past relevant work but had the residual functional capacity (RFC) to perform a wide range of light work on a sustained basis. (Tr. 16-17).

Specifically, the ALJ found Winford could lift and carry 10 pounds frequently and 20 pounds occasionally; push and pull 10 pounds frequently and 20 pounds occasionally; and stand/sit/walk for 6 hours out of an 8-hour work-day. (Tr. 16-17). The ALJ also found Winford had postural limitations in that he was unable to squat and manipulative limitations of only occasionally operating foot controls with his left lower extremity. (Tr. 17). The ALJ therefore found Winford not disabled within the meaning of the Social Security Act. (Tr. 20).

On August 9, 2005, Winford requested a review on the record. (Tr. 7). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Winford's request for review. (Tr. 3-6).

**Evidence Presented:**

At the hearing before the ALJ, Winford testified that he was forty years old, attended school through the eleventh grade and has a general equivalency diploma (GED). Winford

indicated he had worked for a cable company putting in cable, a construction company running a drill at a rock quarry, a waste management company fixing and repairing trucks and occasionally going out on the truck and picking up refuse, a water department as a back hoe operator, and a plumbing company as a laborer. (Tr. 301-308).

His alleged date of onset is September 1, 2001, because that is about the time he started having "real shooting pains" through his left hip and down his left leg. (Tr. 308). Winford hadn't consulted a doctor about the pains. (Tr. 309). In fact, he testified he hadn't been to a doctor in quite awhile and didn't currently have a family or treating doctor. (Tr. 309-310). He stated he has had pains for a long time and has just tried to keep working. (Tr. 309).

Since September of 2001, Winford testified he has done some odd jobs but nothing sustained. (Tr. 309). He indicated that no one wanted to hire you if you wrote down on the job application that you had back troubles. (Tr. 317). Winford indicated he hadn't ben able to find a decent job. (Tr. 317). He stated he lives in Huntington which is forty miles from Fort Smith. (Tr. 317). Without having a way of getting back and forth, Winford testified there was no way for him to find anything. (Tr. 317).

He worked as a meter reader for two months but could not do the job because it involved getting up and down on his hands and knees all day. (Tr. 317). Beginning in the Fall of 2001, for about six months, Winford worked from Ed Chaney and was paid in cash. (Tr. 319. However, Chaney paid Winford less than Chaney promised and Winford quit to get something else. (Tr. 319).

When asked what the problem was today that kept him from working, Winford replied that it was his lower back, around his hip and the top of his pelvis. (Tr. 309). On a scale of one

to ten with ten being the worse pain, Winford rated his pain at a six or seven most of the time. (Tr. 320). The pain interferes with his thinking and concentration. (Tr. 320). Winford takes no prescription medication. (Tr. 309). He takes over the counter Motrin and Tylenol. (Tr. 309).

The pain wakes him up every night. (Tr. 319). Because of this, he gets grouchy and sleepy during the day. (Tr. 320). He catches himself napping all the time. (Tr. 320). For the last year, he testified he had probably napped two or three times a day for twenty minutes to an hour. (Tr. 320).

Winford also testified that he has some numbness in the fingers of his left hand. (Tr. 321). He indicated he cannot get enough grip in his left hand to open a jar. (Tr. 321).

Winford indicated he does not have any insurance coverage and no income coming in. (Tr. 310). Because of this, he testified he can't really afford to go to the doctor. (Tr. 310).

Following his accident in 1993, Winford testified his left leg was repaired by the placement of a rod that goes from his hip to his knee. (Tr. 311). His left arm was repaired by the placement of plates and pins. (Tr. 311).

Winford testified he can't get up from a squatting position. (Tr. 311). He is not sure if that is due to the rod in his leg as much as to his ankles. (Tr. 311). During the accident, Winford testified his feet were folded back where his toes were almost touching his shin bones. (Tr. 311). When he gets down in a squatting position or on his knees, he has to use something to get back up. (Tr. 311-312).

With respect to the cardiac arrhythmia, Winford testified his heart just starts pounding and he gets dizzy. (Tr. 312). There isn't anything in particular that brings it on. (Tr. 313). It

AO72A
(Rev. 8/82)

might happen once every two or three months and then not happen again for six months. (Tr. 313).

In 2000, Winford indicated he had trouble with drinking and threatened suicide. (Tr. 313). He doesn't currently have any problem with drinking. (Tr. 313). For a period of time he was placed on Zoloft for depression. (Tr. 314). He isn't taking it today because his wife said it made him worse. (Tr. 314). The Zoloft didn't help at all. (Tr. 314).

When asked to describe the depression as it exists today, Winford testified that he feels like he is a burden to everyone. (Tr. 314). For awhile the depression was so bad, he had thoughts of suicide. (Tr. 314-315. However, it has been two or three years since it was that bad. (Tr. 315).

Winford testified he has difficulty concentrating on what he is supposed to be doing when he has other things he is thinking about such as family life and paying the bills. (Tr. 315). Worry keeps him from focusing. (Tr. 315). He also has trouble sleeping. (Tr. 316).

Winford testified it is hard to get up and get motivated. (Tr. 316). He has lots of things he would like to do but it hurts too bad to do them. (Tr. 316). He has no problem dealing with people. (Tr. 316).

Winford testified he and his wife live with his mother. (Tr. 315). He has to pick up after himself and wash dishes. (Tr. 315).

Winford testified he can mow his yard with a riding lawn mower but it takes longer than it used to. (Tr. 322). He stated he used to be able to mow the whole yard in an hour or an hour and a half and now it takes him three and a half hours to five hours depending on how he feels. (Tr. 322).

AO72A
(Rev. 8/82)

For a time after his accident, he worked at a Pizza Inn running dishes through a dishwasher. (Tr. 322). He had a stool with an arm rest on it he could use. (Tr. 323). When asked if he could do that job now, Winford replied he didn't know if he could or not. (Tr. 323).

David O'Neal, a vocational expert, was asked some hypothetical questions. (Tr. 326). For purposes of the hypothetical questions, O'Neal was asked to assume that the claimant had the same vital statistics as Winford, the same education, and same vocational background. (Tr. 326). O'Neal was then asked to:

> assume as far as exertional limitations . . . the individual could lift and carry 50 pounds occasionally and 25 pounds frequently and could push and pull within those limitations; could stand and walk for six hours of an eight hour work day and could sit for at least six hours of an eight hour work day. As far as postural limitations are concerned, the individual is unable to squat and rise from that position. And manipulative limitations. The individual can only occasionally operate foot controls with his left lower extremity.

(Tr. 326). With those limitations, O'Neal testified the hypothetical claimant could perform none of Winford's past relevant work. (Tr. 326).

However, O'Neal testified there were other jobs the hypothetical claimant could perform on a sustained basis. (Tr. 327). These jobs include kitchen helper and production laborer. (Tr. 327).

O'Neal was then asked the following hypothetical:

> let's assume exertionally that the individual can lift and carry 20 pounds occasionally and 10 pounds frequently and can push and pull within those limits. Can stand and walk for up to six hours of an eight hour work day and can sit for at least six hours of an eight hour work day. On postural limitations, again, the individual is unable to squat. And on manipulative limitations can only occasionally operate foot controls with the left lower extremity.

(Tr. 328).

AO72A
(Rev. 8/82)

O'Neal indicated this hypothetical claimant would be at the light exertional rating. (Tr. 326). O'Neal indicated this individual would be able to perform jobs such as poultry worker, food preparation worker, cooker, and assembler. (Tr. 328-329).

O'Neal was then asked to add the following limitation: due to lack of refreshing sleep and pain at some level on a fairly regular basis the individual would have periods several days a week in which he would have difficulty maintaining attention and concentration on a sustained basis. (Tr. 330). If the difficulty in maintaining attention and concentration was defined as the inability to make decisions or to attend to detail, O'Neal testified it would not eliminate the unskilled, light position. (Tr. 330).

Finally, O'Neal was asked to add the limitation that the pain was at such a level that it would frequently, 50 percent plus of the time, cause serious difficulty maintaining attention and concentration. (Tr. 330). Serious was defined as one-half to two-thirds of the time and serious difficulty as more than just mild to moderate difficulty. (Tr. 330-331). O'Neal testified this limitation would eliminate the job base. (Tr. 331).

O'Neal indicated the jobs required hourly attendance and Winford would not be able to take unscheduled breaks. (Tr. 331). Further, if Winford had some limitations on his left hand that would affect his ability to work, O'Neal testified it would cut the numbers of jobs that he identified and eliminate some of them. (Tr. 332).

The medical and vocational evidence in the transcript reveals the following. In February of 1980, Winford had a fracture of his right zygomatic arch, a laceration of the upper right eyelid, multiple abrasions on his forehead, and widening of the right sacroiliac joint. (Tr. 254). He also had a fractured pelvis and acetabulum. (Tr. 255). The injuries were the result of an automobile

-7-

accident. (Tr. 255). Winford underwent surgery for his orbit and facial fracture on the right as well as the zygomatic arch fracture on the left. (Tr. 255). He was treated with traction for the fractured pelvis and acetabulum. (Tr. 255).

In March and April of 1985, Winford was diagnosed as having a lumbar strain. (Tr. 128). X-rays of his lumbar spine showed scoliosis of the mid lumbar region and no other pathologic changes. (Tr. 131).

On December 1, 1993, Winford was involved in a motor vehicle accident and admitted to St. Edward Mercy Medical Center. (Tr. 153). Winford was diagnosed with: open fracture of the left femur, grade II; both-bone forearm fracture, left arm; soft tissue injury, right leg; paroxysmal supraventricular tachycardia; post-traumatic pericarditis; and a maxillary sinus fracture, left. (Tr. 155-156). He remained hospitalized until December 12, 1993. (Tr. 155).

During the hospitalization, Winford initially underwent an open reduction and internal fixation of the midshaft fractures of the left radius and ulna with a surgical plate and screws, open treatment of the left femur fracture, and debridement and repair of the soft tissue injury to the right leg. (Tr. 160). On December 6, 1993, he then underwent an open reduction and internal fixation of the fracture of the midshaft of the left femur with an intramedullary rod and the placement of a hip screw through the upper portion of the rod for fixation of a fracture of the base of the femoral neck left hip. (Tr. 158). Winford was prescribed Verapamil for the tachycardia. (Tr. 156).

On March 3, 1994, Dr. Wolfe noted Winford was doing "very, very well" and could progress to full weight bearing. (Tr. 118). Dr. Wolfe also noted that Winford had full range of

AO72A
(Rev. 8/82)

motion of the elbow and wrist. (Tr. 118). Dr. Wolfe opined that Winford could return to work in six to eight weeks. (Tr. 118).

On January 5, 1998, Winford was seen at the emergency room complaining of chest pain. (Tr. 150). No active cardiac or pulmonary disease was detected. (Tr. 152). He was told to resume his Verapamil and rest. (Tr. 150).

On January 22, 1999, Winford was seen in the emergency room after he was struck in the face with a piece of rebar while on the job. (Tr. 144-145). There was evidence of soft tissue injury but no acute facial trauma. (Tr. 147-148).

On December 14, 1999, Winford was seen by Dr. Lance Barton. (Tr. 124). Winford indicated he need a refill of his Verapamil and believed he was taking the medication because of a heart irregularity. (Tr. 124). From Winford's description, Dr. Barton believed Winford had supraventricular tachycardia and Winford was given a refill of the Verapamil for one year. (Tr. 124).

On August 11, 2000, Winford was admitted to St. Edward Mercy Medical Center due to acute alcoholic intoxication with a suicide gesture with possible overdose. (Tr. 201). He had apparently threatened suicide at home by placing a knife to his throat. (Tr. 202). He was discharged the following day and prescribed Midrin for headache and Zoloft for depression. (Tr. 201). He was to follow-up with Dr. Barton in two weeks. (Tr. 201).

On December 20, 2000, Winford was seen at the emergency room complaining of left sided chest pain and arm pain. (Tr. 192-195). A chest x-ray showed no active cardiopulmonary disease. (Tr. 193).

AO72A
(Rev. 8/82)

On May 29, 2001, Winford was treated at the emergency room for a sunburn on his right foot. (Tr. 141). On November 11, 2002, Winford was seen by Dr. Emad Al-Ghussain. (Tr. 292). Winford reported having episodes of palpitations after he ran out of Verapamil. (Tr. 292). It was also noted he had borderline hypertension. (Tr. 292). Winford denied any chest pain or shortness of breath. (Tr. 292). Winford's prescription was refilled but he declined to have any blood work done because he didn't have any insurance. (Tr. 292).

On May 4, 2003, Winford was seen at the emergency room at St. Edward Mercy Medical Center complaining of sore throat and swelling. (Tr. 140). He was diagnosed with acute tonsillitis. (Tr. 140).

On January 27, 2004, Winford completed a supplemental interview outline. (Tr. 83-87). He indicated he could take care of his own personal care needs without assistance. (Tr. 83).

He stated he could vacuum/sweep, take out the trash, do home repairs, repair appliances, repair the car, wash the car, mow the lawn, rake leaves, and do garden work. (Tr. 83). However, he stated he could do a lot of things for a short while but once he started to hurt he had to stop. (Tr. 83). He indicated he could not do laundry, the dishes, or change sheets. (Tr. 83).

He stated he could not shop for groceries, clothes, do the banking, or go to the post office. (Tr. 83). Winford indicated he could not count change and needed help with money. (Tr. 83).

Winford indicated he prepared meals three or four times a week including sandwiches, frozen dinners, meats, and vegetables. (Tr. 84). He indicated it did not take him long to prepare a meal. (Tr. 84).

Winford indicated he could not pay bills, use a checkbook, or count change. (Tr. 84). He stated he had trouble with math and numbers. (Tr. 84).

-10-

Winford indicated he can drive including along unfamiliar routes. (Tr. 84). He stated he cannot walk for exercise or errands due to his ankles and legs. (Tr. 84). He sometimes uses a cane when walking. (Tr. 84). Winford spends his time attending church, watching television, listening to the radio, reading, and visiting with friends and relatives. (Tr. 84).

He indicated his disability had made him quit his job or he had been fired in excess of six times. (Tr. 84). He stated he gets where he cannot stand or do the manual labor any longer. (Tr. 84).

He indicated he had suffered from unusual fatigue since 1993 and had to rest once a day for three hours. (Tr. 85). When asked to describe his pain or other symptoms, Winford replied that he hurt everywhere that he had broken bones–legs, ankles and arm. (Tr. 85). When asked where his pain was located, he indicated his left arm, left leg, ankles, right leg, and back. (Tr. 85). He indicated the pain was a constant ache. (Tr. 85).

Winford stated that activity almost made the pain unbearable at times. (Tr. 85). Winford indicated he could stand or walk fifteen minutes and sit thirty minutes before the pain occurred. (Tr. 85). He stated he sometimes hurt for no reason and other times he hurt because of activities. (Tr. 85).

Winford indicated nothing helped with the pain except rest. (Tr. 85). He indicated he only took over-the-counter medications because other medications caused problems with his stomach. (Tr. 85). Since his disability began on an average day, Winford indicates he sits around the house and helps his wife some. (Tr. 86).

On February 27, 2004, Winford was seen at the emergency room of St. Edward Mercy Medical Center. (Tr. 139). He had a laceration on his right leg that he suffered when a lawn

AO72A
(Rev. 8/82)

mower he was lifting caught him in the pants and a piece of sheet metal from it cut him. (Tr. 139). The wound was sutured. (Tr. 139).

On May 3, 2004, Winford underwent a general consultative physical examination performed by Dr. Gordon W. McCraw. (Tr. 276-282). Winford reported having last worked in 2003 at a construction job. (Tr. 276). Winford reported having suffered an injury to his left leg with repair by placement of a metal rod, an injury to his left arm that was surgically repaired, and ankle injuries in a motor vehicle accident. (Tr. 276). He indicated he was on no medications. (Tr. 276). He also reported a history of back pain and depression. (Tr. 278).

Winford's range of motion of his cervical spine, lumbar spine, and extremities were all within normal limits. (Tr. 279). No muscle spasms were present and his straight-leg raising was normal. (Tr. 279). His neurological examination was normal and his gait and coordination within normal limits. (Tr. 280). Winford could hold a pen and write, touch fingertips to palm, oppose thumb to fingers, pick up a coin, stand and walk without assistive devices, and walk on heel and toes. (Tr. 280). His grip strength was 100%. (Tr. 280). Winford could not squat and arise from a squatting position. (Tr. 280). It appears Dr. McCraw indicated Winford had mild to moderate limitations on his ability to walk, stand, sit, lift, carry, handle, finger, see, hear, or speak. (Tr. 282).

On May 11, 2004, Dr. Steve Owen, a medical consultant, completed a residual physical functional capacity assessment on Winford. (Tr. 283-290). With respect to exertional limitations, it stated Winford could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was limited in the

lower extremities to the occasional use of foot controls on the left. (Tr. 284). No postural, manipulative, visual, communicative or environmental limitations were established. (Tr. 285-287). At that time, there was a treating or examining source statement regarding Winford's physical capacities in the file. (Tr. 289).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results

-13-

from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

We first address the ALJ's assessment of Winford's subjective complaints. The ALJ was required to consider all the evidence relating to Winford's subjective complaints including evidence that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints

where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The medical evidence shows plaintiff suffered multiple fractures in an automobile accident in 1993 causing him to have several surgeries. (Tr. 155-156). Following his discharge from the hospital, Winford was reported to be doing "very, very well." (Tr. 118). By March of 1994, he was told he could progress to full weight bearing as tolerated and Dr. Wolfe, Winford's orthopaedic doctor, indicated Winford would be able to return to work in six to eight weeks. (Tr. 118). There is no further indication that Winford complained of problems with his left arm, left leg, or left hip and the record does not indicate he returned to see Dr. Wolfe or any other orthopaedic doctor.

In May of 2004, Winford's range of motion in his cervical spine, lumbar spine, and all extremities was normal. (Tr. 279). His gait was normal. (Tr. 280). His grip was normal. (Tr. 280).

As the ALJ noted, Winford testified he was taking no prescription medication. (Tr. 15). Further, when he was taking prescription medication, the medical records contain no indication plaintiff reported problems with his medications to any of his physicians. There is no indication

Winford was regularly seeking medical care. *See Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding that the lack of medical evidence supporting a claimant's subjective complaints is a factor that supports the discounting of such complaints). While Winford did testify he did not have any insurance and could not afford prescription medication or visits to physicians, there is no indication he sought low cost or free medical care or was denied medical care because of his lack of funds. *See e.g., Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003)(no evidence claimant attempted to obtain treatment or was denied treatment because of insufficient funds or insurance); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999)(ALJ appropriately discounted claimant's argument he could not afford medical care absent evidence he sought and was denied low-cost or free care); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989)(although lack of funds may sometimes justify failure to seek medical care, there was no evidence plaintiff had told his physicians he could not afford the prescription at issue and was denied the medication).

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities. In a supplemental interview outline dated January 27, 2004, Winford indicated he could take care of his own personal needs, take out the trash, do home repairs, repair appliances, repair the car, wash the car, mow the lawn, rake leaves, and do garden work. (Tr. 83). Although he indicated he could only do these things for a short period of time, he also indicated in a disability report that he quit working because of disagreements with management and not because he was physically unable to do his job. (Tr. 83 & 75). *Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999) (plaintiff's ability to care for himself, do household chores, drive a car short distances, and perform other miscellaneous activities was inconsistent with his subjective

AO72A
(Rev. 8/82)

complaints); *Pena v. Cater*, 76 F.3d 906, 908 (8th Cir. 1996) (ALJ properly discounted claimant's subjective complaints on basis that claimant was able to care for child, drive car, and sometimes go to grocery store); *Johnston v. Halala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television and drive indicated her pain did not interfere with her ability to concentrate; claimant's visits with her children indicated she could engage in some social functioning).

Winford testified at the hearing before the ALJ that he was able to work after his alleged date on onset but was unable to find a decent job. (Tr. 317). With respect to a job he worked in for approximately six months in late 2001 and early 2002, Winford testified he quit because of a disagreement over his pay and because of the way his boss was treating him. (Tr. 319).

Therefore, although it is clear that plaintiff's abilities are limited to some extent, he has not established that he is unable to engage in any gainful activity. Neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints are only credible to the extent that they support the ALJ's assessment of his RFC.

Next, we turn to whether the ALJ erred in not referring Winford for a consultative examination by an orthopedic specialist. The ALJ has a duty to develop the record fully. *See e.g., McGhee v. Harris,* 683 F.2d 256, 260 (8th Cir. 1982). " 'It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.' " *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir. 1992) (citation omitted).

AO72A
(Rev. 8/82)

In this case, however, we conclude "there was substantial evidence in the record to allow the ALJ to make an informed decision." *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001). The consultative general physical examination was ordered and the ALJ had the records from Winford's hospital admission following the motor vehicle accident as well as the existing medical records regarding his treatment since that time including his follow-up visits to his own orthopedic doctor shortly after his release from the hospital. The ALJ also had the testimony of both the plaintiff and a vocational expert. In short, "[t]he record contained substantial evidence to support the ALJ's decision." *Id.*

With regard to Winford's alleged problems with depression, the ALJ correctly noted that Winford did not mention any mental impairment in his application. Further, the only mention of any current or past treatment for this alleged impairment was in connection with a suicide gesture in August of 2000. While Winford was prescribed Zoloft, he did not continue to take this medication and sought no other medical or psychological intervention.

Finally, we turn to the ALJ's assessment of plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id.* This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a

claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id*.

In the present case, the ALJ considered a residual functional capacity assessment prepared by a non-examining agency medical consultant, the results of a general physical consultative examination, plaintiff's subjective complaints, and his medical records. Based on our above discussion of the medical evidence and plaintiff's daily activities, we believe substantial evidence supports the ALJ's RFC determination.

**Conclusion**:

For the reasons stated, I find that the decision of the Commissioner should be and hereby is affirmed. A separate judgment in accordance with the above will be entered.

Dated this 29th day of September 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)